ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| SADIEL BARRIENTOS FLORES, por sí y en representación de la sociedad legal de gananciales que compone con ILEIN RIVERA RODRÍGUEZ Y OTROS | | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón |
|---|---|---|
| APELANTES | KLAN202500312 | |
| v. | | |
| BELLA INTERNATIONAL, LLC; BELLA AUTO GROUP DEL SUR, LLC Y OTROS | Consolidado | Civil núm.: BY2021CV04236 |
| APELADOS | | |
| SADIEL BARRIENTOS FLORES, por sí y en representación de la sociedad legal de gananciales que compone con ILEIN RIVERA RODRÍGUEZ Y OTROS | KLCE202500389 | |
| APELADOS | | Sobre: discrimen en el trabajo; violación a derechos civiles y constitucionales; despido injustificado; acoso laboral; Art. 74 del Código Civil |
| v. | | |
| BELLA INTERNATIONAL, LLC; BELLA AUTO GROUP DEL SUR, LLC Y OTROS | | |
| APELANTES | | |

Panel integrado por su presidenta, la Jueza Ortiz Flores, la Jueza Romero García y el Juez Rivera Torres

**Ortiz Flores, Jueza Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 18 de julio de 2025.

Comparecen ante este foro revisor los señores Sadiel Barrientos Flores, Luis E. Suárez Rosado, Argelis Hernández Negrón, José David Ortiz Cintrón y las señoras Milagros Rodríguez Morales y Delma Jenette Torres Jiménez (en conjunto, apelantes-demandantes) mediante el recurso KLAN2025000312 y nos solicitan

Número Identificador
SEN2025_____

que revoquemos la *Sentencia Sumaria Parcial y Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI) emitida el 18 de febrero de 2025 y notificada el 20 de febrero de 2025. En el aludido dictamen, el TPI dictó sentencia sumaria parcialmente donde desestimó las causas de acción de discrimen por creencias religiosas y mantuvo la acción de despido injustificado para ser vista en sus méritos.

De igual manera, comparecen ante nosotros Bella International, LLC; Bella Auto Group del Sur, LLC; Automotive Distributor Group, LLC y Bella Auto Group, LLC (en conjunto, Bella o apelantes-demandados) mediante el recurso KLCE202500389 y nos solicitan que revoquemos la misma *Sentencia Sumaria Parcial y Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Se acoge el recurso de *certiorari*, presentado por Bella, como un recurso de apelación por solicitarse revisión de una sentencia parcial dictada al amparo de la Regla 42.3 de las de Procedimiento Civil, no obstante, este mantiene su alfanumérico KLCE202500389.

Adelantamos que, por los fundamentos que expondremos a continuación, modificamos el referido dictamen y así modificado, confirmamos.

**I**

El 19 de octubre de 2021, los señores Sadiel Barrientos Flores, Luis E. Suárez Rosado, Argelis Hernández Negrón, José David Ortiz Cintrón y las señoras Milagros Rodríguez Morales y Delma Jenette Torres Jiménez presentaron una *Demanda* contra su antiguo patrono, Bella, a causa de discrimen por motivos religiosos, violación de derechos constitucionales, despido injustificado al amparo de la Ley Núm. 80 y acoso laboral por motivos de vacunación compulsoria contra el virus COVID-19. En base a sus alegaciones, solicitaron como remedio indemnización monetaria a raíz de los

alegados daños ascendente a $350,000.00 para cada demandante y $500,000.00 para la Sra. Rodríguez Morales.[1] Luego de contestada la *Demanda*, realizado el descubrimiento de prueba y varios trámites procesales que no resultan pertinentes pormenorizar, los apelantes-demandantes sometieron, el 2 de octubre de 2024, cada uno sus solicitudes de sentencia sumaria ante el foro de instancia.[2] En estas alegaron que no había legislación ni jurisprudencia alguna que permitiera a un patrono establecer una política de vacunación compulsoria como condición de empleo. Asimismo, Bella presentó seis (6) solicitudes de sentencia sumaria dirigidas de manera individual a las causas y reclamaciones de cada uno de los apelantes-demandantes.[3] En estas arguyó que los demandantes carecían de causa de acción alguna al amparo de la Ley Núm. 80, pues no habían sido despedidos injustificadamente y muchos menos procedían reclamaciones de discrimen pues no habían podido establecer un caso *prima facie*. Por lo anterior, solicitó que se desestimaran todas las demandas en su totalidad.

Cada una de las sentencias sumarias fueron debidamente contestadas y el foro primario emitió una determinación titulada *Sentencia Sumaria Parcial y Resolución* donde realizó las siguientes determinaciones de hechos:

1. Sadiel Barrientos Flores, (en adelante "Barrientos"), es mayor de edad, casado con Ilein Rivera Rodríguez, vecino de Vega Alta, con dirección en Urb. Santa Rita, calle 6 H-34, Vega Alta.

2. Milagros Rodríguez Morales, (en adelante "Rodríguez), es mayor de edad, soltera, vecina de San Juan, con dirección en #911 Roberto S. Vilella Ave. Urb. Country Club, San Juan.

3. Luis E. Suárez Rosado, (en adelante "Suárez"), mayor de edad, soltero, vecino de Vega Baja.

4. Argelis Hernández Negrón, (en adelante "Hernández"), mayor de edad, casado con Juliette M.

---

[1] Apéndice del recurso KLAN202500312, págs. 1-25.
[2] Apéndice del recurso KLAN202500312, págs. 141-932.
[3] Apéndice del recurso KLCE202500389, págs. 1254-1916.

Chárriez Rosado, vecino de Toa Alta, con dirección Urb. Hacienda Leyla Calle 2 B-3 Toa Alta.

5. José David Ortiz Cintrón, (en adelante "Ortiz"), mayor de edad, con dirección postal en Urb. Bella Vista Calle Rosa A-11 en Aibonito.

6. Delma Jenette Torres Jiménez, (en adelante "Torres"), mayor de edad, con dirección postal HC 2 Box 7432, Orocovis PR 00720. Dirección residencial Barrio Gatos, Carretera 155, km 33.1, Orocovis.

7. Bella International, LLC, (en adelante "BIC"), es una compañía de responsabilidad limitada, organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, debidamente registrada en el Departamento de Estado, con dirección postal P.O. Box 190816, San Juan, P.R. 00919- 0816.

8. Bella Auto Group del Sur, LLC, (en adelante, "BAGDS"), es una compañía de responsabilidad limitada, organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, debidamente registrada en el Departamento de Estado, con dirección postal P.O. Box 190816, San Juan, P.R. 00919- 0816.

9. Bella Auto Group, LLC, (en adelante "Bella"), es una compañía de responsabilidad limitada, organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, debidamente registrada en el Departamento de Estado, con dirección postal P.O. Box 190816, San Juan, P.R. 00919- 4147.

10. International Automotive Distributor Group, LLC, (en adelante "IADG"), es una compañía de responsabilidad limitada, organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico, debidamente registrada en el Departamento de Estado, Número de Registro 318122, Presidente, Carlos A. López-Lay, con dirección: P.O. Box 190816, San Juan, Puerto Rico.

11. Barrientos trabajó para Bella Auto Group del Sur, LLC.

12. Milagros Rodríguez Morales, Luis Suárez Rosado y José David Ortiz Cintrón trabajaron para Bella International, LLC.

13. Delma Jennette Torres Jiménez trabajó para International Automotive Distributor Group, LLC.

14. El señor Carlos López-Lay es el presidente y CEO de Bella Group.

15. Elisa Pacheco era la directora de Recursos Humanos de Bella Group.

16. En las diferentes facilidades de los demandados se colocaron anuncios de que sus empleados estaban 100% vacunados.

17. El 3 de mayo de 2021, Bella Group envió una carta en la cual "solicitó al personal que se vacunen, para así mantener la continuidad de las operaciones y ayudar a lograr la inmunidad del rebaño. Para ello, se estableció el 31 de mayo de 2021, como la fecha límite para que todo el personal tuviera la primera dosis de la vacuna y la segunda dosis para el 28 de junio de 2021".

18. Mediante la carta del 3 de mayo de 2021, Bella Group informó a sus empleados que; "de haber personas que no se pudieran vacunar por razones médicas o religiosas, se tomaría en consideración, pero deberán comunicarse con el Departamento de Recursos Humanos."

19. La parte demandada notificó el 8 de junio de 2021 mediante carta enviada a todos sus empleados que había adoptado "un riguroso plan de control y prevención de exposición COVID-19 y las medidas que hemos tomado han sido adoptándose de acuerdo con las Órdenes Ejecutivas, recomendaciones del CDC (Center for Desease Control) y agencias gubernamentales". Entre estos estableció el requisito de vacunación como una herramienta para combatir el COVID-19, poder regresar a la normalidad y mantener una operación adecuada.

20. El 5 de julio de 2021 Bella Group volvió a enviar a su plantel las medidas cautelares para evitar el contagio y propagación del COVID-19 conforme las Ordenes OE2021-054 y OA-2021-508.

21. Ninguna Orden Ejecutiva ni Orden Administrativa, a la fecha de la política de vacunación impuesta por la parte demandada, como tampoco a la fecha de despido requería a la industria automotriz el uso mandatorio de vacunas a sus empleados.

22. Las exoneraciones religiosas solicitadas eran evaluadas por la señora Eliza Pacheco, el señor José Alvarado y el Lcdo. Miguel Simonet.

23. La parte demandada no tenía un manual de guías de evaluación para verificar las solicitudes de exoneración médicas o religiosas.

24. Las únicas consideraciones contempladas en la política de la empresa que pudieran conllevar un acomodo razonable, era por razón de impedimento médico o creencia religiosa.

25. Aquellos empleados de la parte demandada que no se vacunaron y no cualificaron para alguna de las excepciones provistas por el patrono donde no fue factible un acomodo razonable; fueron dados de baja del registro de empleados.

26. La postura de Iglesia Católica a la vacunación surge de Nota de la Congregación para la Doctrina de la Fe sobre moralidad del uso de algunas vacunas contra el Covid-19, con fechada el 21 de diciembre de 2020.

27. Mediante Orden Ejecutiva del 12 de marzo de 2020 (OE-2020-20), la entonces gobernadora de Puerto Rico declaró un estado de emergencia en todo Puerto Rico como resultado del brote del coronavirus o COVID-19.

28. Mediante Orden Ejecutiva del 15 de marzo de 2020 (OE-2020-023), la gobernadora de Puerto Rico ordenó el cierre de los establecimientos comerciales.

29. A consecuencia de la Orden Ejecutiva (OE-2020-023), del 15 de marzo de 2020 el conglomerado de Bella Group cesó operaciones hasta tanto el Gobierno permitió su reapertura, por lo que permaneció cerrado setenta y dos (72) días.

30. Mediante la Orden Ejecutiva (OE-2020-042), la cual entró en vigor el 26 de mayo de 2020, la Gobernadora de Puerto Rico permitió reabrir parcialmente el sector de venta de autos, con ciertos requerimientos tales como: asegurarse de que no se exceda la ocupación máxima equivalente al cincuenta por ciento (50%) de la capacidad establecida en el código de edificación vigente en Puerto Rico (PR Building Code 2018), se haya sometido al Departamento del Trabajo y Recursos Humanos su plan de medidas de prevención y obtenido la auto certificación requerida por esta Orden Ejecutiva, que los clientes tengan cita previa y se esté cumpliendo estrictamente con las medidas cautelares respecto al obligatorio de uso de mascarillas, evitando la conglomeración de personas y cumpliendo con el distanciamiento social.

31. Como parte de las medidas tomadas por el Gobierno de Puerto Rico para enfrentar el estado de emergencia causado por la Pandemia, la Gobernadora Wanda Vázquez mediante Orden Ejecutiva 2020-23, del 15 de marzo de 2020, inter-alias, ordenó a toda persona, con sospecha razonable de exposición a la enfermedad COVID-19, a permanecer en cuarentena durante un periodo de 14 días. De la persona estar infectada, la orden disponía para un período de aislamiento de 14 días también.

32. Tras la aprobación del uso de vacunas Pfizer y Moderna, el 21 de enero de 2021, el Secretario del Departamento de Salud de Puerto Rico emitió la Orden Administrativa Núm. 478, en la que inter-alias, indica se comenzó la vacunación en Puerto Rico para combatir el COVID-19.

33. El 21 de enero del 2021, el Secretario del Departamento de Salud de Puerto Rico, mediante Orden Administrativa Núm. 478 decretó que la

distribución, manejo y administración de la vacuna COVID-19 era la gestión principal del Departamento de Salud de Puerto Rico para regresar a la normalidad.

34. En la Orden Administrativa Núm. 2021-496 el Secretario de Salud del Departamento de Salud de Puerto Rico estableció que, a partir del 12 de abril de 2021, todo ciudadano mayor de 16 años sería elegible para recibir la vacuna de COVID-19.

35. En la Orden Administrativa Núm. 2021-508, la postura pública del Secretario de Salud de Puerto Rico fue que "[e]s claro que con la vacunación hemos logrado alcanzar avances significativos en la lucha contra este virus".

**Sadiel Barrientos Flores ("Barrientos"):**

36. Sadiel Barrientos Flores ocupaba un puesto como asesor de servicio para Volkswagen para BAGDS desde el 2 de marzo de 2011 hasta su despido el 16 de julio de 2021.

37. Al momento de su terminación de empleo devengaba un salario de $5,166.00 mensuales.

38. Como asesor interactuaba diariamente con clientes, los recibía y dialogaba con estos para hacer reparaciones o mantenimiento. Al igual que, tenía que interactuar con los técnicos en el taller y reunirse con sus supervisores.

39. El 6 de julio de 2021, se le envió carta a Barrientos indicando que; "ante su negativa de no vacunarse, tras evaluar las razones provistas para ello, y analizar la posibilidad de un acomodo razonable; BAGDS no identificó un acomodo razonable debido a la naturaleza de las funciones del puesto". Sin embargo, le ofreció un periodo de cuarenta ocho (48) horas para presentar alguna alternativa de acomodo razonable a Recursos Humanos y las razones por las que se debe considerar tal alternativa.

40. Barrientos le indicó a BAGDS que no se vacunaba debido a su creencia como "cristiano evangélico" y a estos efectos presentó el 8 de julio de 2024, una declaración jurada firmada por él y el ministro Luis Acevedo Ramos.

41. Según la declaración jurada del ministro Ramos; "dicha religión no objeta el uso de todas las vacunas, sino únicamente aquellas que se desarrollan a base de líneas de células fetales."

42. En la carta del 9 de julio de 2021, se le concedió Barrientos un término final hasta el 15 de julio de 2021, para que presentara evidencia de vacunación o, de lo contrario, se entendería que no desea

continuar con su empleo en la empresa y se le daría de baja de los registros[.]

43. El 13 de julio de 2021 Barrientos junto a Luis Suarez y Milagros Rodríguez, a través de su representante legal, enviaron carta al Dpto. de Recursos Humanos de Bella Group, en la que cuestionan la política impuesta por la empresa y solicitaron poder discutir la misma.

44. Bella Group nunca contestó la carta ni le concedieron a Barrientos una oportunidad para discutir la misma.

45. El 16 de julio de 2021, se le envió una carta al Demandante informándole que dado a que no había presentado evidencia de vacunación en o antes del 15 de julio de 2021, se le estaba dando de baja de los registros de BAGDS.

**Milagros Rodríguez Morales (Rodríguez"):**

46. Milagros Rodríguez Morales fue empleada del conglomerado de Bella Group desde 1991, cuando comenzó a trabajar para Bella Travel, la cual, por acuerdo le reconoció dos años (desde 1989) adicionales de antigüedad al haber adquirido a su patrono anterior de World Travel Promotion siendo su última posición Oficial de Compra ("Oficial") en la División de Piezas de Auto.

47. Según su talonario devengaba un salario a razón de $10.00 la hora por 40 horas a la semana.

48. Rodríguez se desempeñaba en el área de compras de piezas de Bella International y había tenido varias funciones dentro de la empresa.

49. Rodríguez desempeñaba sus labores en el edificio ubicado en el Municipio de Cataño que contiene oficinas y almacén y mide unos 60,000 pies cuadrados.

50. Las labores que ejecutaba Rodríguez eran facturación de piezas, material de oficina y almacén a suplidores y devolver piezas a fábrica. Las tareas como inspeccionar piezas las realizaba en el área de almacén. Además, tenía que evaluar si las piezas devueltas cumplen con los parámetros de devolución.

51. Durante la Pandemia, Rodríguez trabajó durante dos meses de forma remota, y luego continuó trabajando presencialmente sin haber tenido ningún incidente en el trabajo, relacionado a contagios de COV-SARS-2, o de ningún otro virus.

52. Luego de haber recibido la política de vacunación de la empresa el 3 de mayo de 2012; Rodríguez sometió carta del Padre Ricardo de la Parroquia San José el

31 de mayo de 2021. Dicha carta hace referencia a la Nota de la Congregación para la Doctrina de la Fe sobre moralidad del uso de algunas vacunas contra el Covid-19, con fechada el 21 de diciembre de 2020. Esta carta apunta que; "...la Nota establece que los fieles de la Iglesia tienen la obligación no sólo de proteger la propia salud, sino también de favorecer el bien común..." Continúa leyendo, "...Al tener ella muy clara conciencia de esta responsabilidad, demuestra así una legítima, auténtica y balanceada objeción de conciencia-que la Iglesia avala y aprueba-para acogerse al necesario acomodo razonable..."

53. La sinceridad de la exoneración religiosa presentada por Rodríguez no fue cuestionada ni puesta en controversia.

54. El 6 de julio de 2021, BIC le entregó a la mano carta a Rodríguez donde se le informó que; "luego de evaluar las razones identificadas por esta para no cumplir con la política de vacunación y tras analizar la posibilidad de un acomodo razonable que le permitiera continuar desempeñando las funciones para cual se le contrató, no se pudo identificar acomodo razonable alguno debido a la naturaleza de las funciones de su puesto, las cuales requieren que trabaje de manera presencial." En dicha carta también se le proveyó un término de cuarenta y ocho (48) horas para presentar opciones de acomodo razonable y le informó que debido al riesgo que presenta el no estar vacunada no puede regresar a trabajar a menos que presente evidencia de vacunación.

55. El 8 de julio de 2021 Rodríguez envió comunicación por correo electrónico a Eliza Pacheco donde expone nuevamente su sentir sobre la obligatoriedad de la vacuna contra el Covid-19 para continuar laborando para Bella International dado a su convicción religiosa y solicitud de acomodo razonable.

56. Las medidas que Rodríguez estaba dispuesta a tomar eran medidas ya implementadas por BIC como lo son el uso de mascarillas y el distanciamiento social.

57. Mediante carta del 9 de julio de 2021, se le informó a Rodríguez que luego de evaluar sus planteamientos y sugerencias de trabajo remoto o de forma aislada propuestos en su carta del 8 de julio de 2021; BIC no pudo considerar los acomodos propuestos por esta debido a que la posición que ocupaba requería interacción continua con distintas personas de la empresa y externas, y que no reducía el potencial de riesgo de tener a una persona no vacunada hacia los demás empleados de la empresa.

58. En la carta del 9 de julio de 2021, se le concedió a Rodríguez un término final hasta el 15 de julio de 2021, para que presentara evidencia de vacunación

o, de lo contrario, se entendería que no desea continuar con su empleo en la empresa y se le daría de baja de los registros.

59. El 16 de julio de 2021 Elisa Pacheco, directora de Recursos Humanos, cursó carta a Rodríguez, indicándole que; "le estaban dando de baja de sus registros ya que al no haber presentado evidencia de vacunación entendían que no le interesaba continuar su empleo."

**Luis E. Suárez Rosado ("Suárez"):**

60. Luis E. Suárez Rosado ocupó un puesto en el Departamento de Licencias y Registros de Bella International, LLC. desde el 27 de septiembre de 2012 hasta su despido el 16 de julio de 2021.

61. El 6 de mayo de 2021 Suárez entregó solicitud de exención religiosa por medio de carta suscrita por su párroco, Padre Carlos Monroig, Esta carta menciona, entre otras cosas que; "por su convicción religiosa, no cree en la vacunación…"

62. La certificación fue entregada de manera física por Suárez en la Oficina de Recursos Humanos, a la Sra. María Santiago.

63. Suárez pertenece a la religión católica.

**Argelis Hernández Negrón ("Hernández"):**

64. Hernández trabajó para Bella Auto Group desde julio de 2019 hasta su despido el 22 de julio de 2021 como técnico automotriz siendo ésta su última posición y devengaba un salario de $1,800.00 mensuales.

65. Las funciones de Hernández como técnico automotriz consistían en diagnosticar y reparar autos en el taller e interactuaba diariamente con sus compañeros de trabajo.

66. El día 6 de julio de 2021, Hernández recibió por BAG carta indicando que no podría regresar a su trabajo al menos que presentara evidencia de vacunación contra el COVID-19, y de no hacerlo antes del 15 de julio [sería] dado de baja del registro. Esta discute la política de vacunación de BAG y, además, se le informó que tenía quince (15) días para presentar evidencia de vacunación. En la comunicación del 6 de julio de 2021, se le informa a Hernández que los días 4 de mayo y 8 de junio de 2021 le enviaron comunicaciones por escrito donde se establecía el requisito de cumplir con la política de vacunación de la empresa.

67. El 6 de julio de 2021 Hernández recibió una llamada de la Sra. Elisa Pacheco indicándole que debía de

vacunarse ya que era requerido para la empresa estar vacunado para seguir trabajando.

68. El 22 de julio de 2021, Suárez recibió carta a través de correo electrónico de BAG donde se le informó que; "ante su negativa de vacunarse y al no presentar evidencia de vacunación, BAG entendió que no le interesaba continuar con su empleo por lo que, procedió a darle de baja de sus registros."

69. Hernández no se vacunó por razones personales. Su negativa no fue por condición médica o creencia religiosa.

**José Ortiz Cintrón ("Ortiz"):**

70. José D. Ortiz Cintrón ocupó el puesto de Técnico Automotriz en el Centro de Servicios de Cayey para el conglomerado de empresas de Bella Group con Bella International, LLC desde el 30 de noviembre de 2020 hasta el 22 de julio de 2021.

71. El demandante devengaba un salario de unos $1,625.00 mensuales al momento de su despido.

72. El 25 de junio de 2021, el Sr. José Ortiz le fue entregado a mano y enviado por correo electrónico documento firmado por Daisy Rodríguez, directora de Recursos Humanos de Bella Group, en la cual se le volvía a explicar la política de vacunación compulsoria acogida por Bella Group y se le concedía un término adicional de 5 días calendario para cumplir con este. También, le concedía un término de 48 horas para informar su oposición ya fuera religiosa o por motivos de salud. Además, se le informó que de ser suspendido y no presentar evidencia de vacunación, dentro de los próximos 15 días desde la suspensión, se le estaría dando de baja de los registros de la empresa.

73. El 25 de junio de 2021, Ortiz procedió a llamar al Departamento de Recursos Humanos y expresar su posición de que no estaba a gusto con la política de vacunación de la empresa.

74. El 1 de julio de 2021 Bella Group envió por correo postal certificado a Ortiz carta de suspensión que informaba que "al no recibir comunicación o evidencia alguna de su parte, comenzando hoy 1 de julio usted no podrá permanecer o regresar a su trabajo hasta tanto cumpla con la política de vacunación de la empresa".

75. Mediante carta del 6 de julio de 2021, se le informó a Ortiz que; "luego de evaluar las razones identificadas por él para no cumplir con la política de vacunación y de analizar la posibilidad de un acomodo razonable que le permitiera continuar desempeñando las funciones para cual se le contrató, no se pudo identificar acomodo razonable

alguno debido a la naturaleza de las funciones de su puesto, las cuales requieren que él trabaje de manera presencial. Dicha carta del 6 de julio de 2021 también menciona que; "no se podía autorizar a Ortiz a trabajar remoto ya que afectaría las operaciones significativamente y seria [sic] contrario a las normas, prácticas, métodos y/o políticas de la empresa. Adicionalmente le concede un terminó de 48 horas a partir del recibo de la carta para presentar alguna alternativa de acomodo razonable, la cual debe incluir las razones de por qué él entiende que se debe considerar tal alternativa".

76. El 7 de julio de 2021, Suárez ofreció [como] alternativa de acomodo razonable el continuar utilizando mascarillas, seguir los protocolos de seguridad establecidos en los comercios que visitaba, tener a un compañero que le entregue y recoja sus documentos, mantener su vehículo desinfectado, llevar él mismo un registro de su jornada laboral para poder someter sus ponches en el sistema sin usar el ponchador y así no entrar a las oficinas.

77. Mediante carta del 9 de julio de 2021, se negó la propuesta presentada por el Demandante, aduciendo que "por la posición que ocupa" la propuesta es contraria a las políticas de la empresa y [que] no es un acomodo razonable "ya que lo sugerido no sólo es contrario a las políticas de Bella, sino que no es un acomodo razonable, ya que no reduce el potencial riesgo de una persona no vacunada hacia los demás empleados de la empresa y otras personas con quienes y le conceden un término final hasta el 15 de julio de 2021 para presentar evidencia de vacunación o de lo contrario le darán de baja de su registro.

78. El 9 de julio de 2021 Ortiz se comunicó con la Sra. Daisy Rodríguez, Directora de Recursos Humanos, por medio de carta en la que solicitaba reconsideración a la suspensión de empleo por falta de vacunación.

79. El 16 de julio de 2021, se le envió carta a Ortiz informándole que dado a que no había presentado evidencia de vacunación, o evidencia que justificara su posición de no vacunarse, en o antes del 15 de julio de 2021, se le estaba dando de baja de los registros de Bella.

### Delma Torres Jiménez ("Torres"):

80. Al momento en que cesó su trabajo, Torres trabajaba para International Automotive Group como especialista en garantías enero de 2013 hasta el 10 de septiembre de 2021.

81. La demandante devengaba un salario de unos $2,769.24 mensuales al momento de su despido.

82. Torres es creyente de la religión católica.

83. El 14 de mayo de 2021 Torres envió carta al Departamento de Recursos Humanos de Bella International explicando las razones por las cuales no estaba de acuerdo con vacunarse.

84. El 25 de junio de 2021 Torres recibió comunicación cursada por Daisy Rodríguez, entonces Directora de Recursos Humanos, pero diligenciada por la Sra. Elisa Pacheco, en la cual se informaba la obligatoriedad de la vacunación como condición de empleo. Esta fue entregada a la mano. También le concedía un término de 48 horas para presentar evidencia que justifique su posición de no vacunarse y un término de cinco (5) días calendario para cumplir con el requisito de vacunación, de lo contrario sería suspendida.

85. Ante ello Torres Jiménez emitió comunicación escrita fechada al 27 de junio de 2021, en la cual, entre otras cosas, reiteró su posición de no vacunación. En esta carta, Torres no proveyó ninguna evidencia de sus condiciones de salud, ni de su creencia religiosa.

86. Torres llegó a ser intervenida y hospitalizada el 30 de junio y estuvo hasta el 7 de julio en el Hospital Menonita CIMA en Aibonito y fue informada IADG mediante certificado médico.

87. Mediante carta del 1 de julio de 2021, IADG concedió a Torres un término de cinco (5) días para presentar la documentación o certificado de su Iglesia que evidencie su reclamo de no vacunarse debido a su creencia religiosa y algún documento médico que certificara la condición de salud que le impedía vacunarse.

88. Mediante carta del 9 de julio de 2021, Torres solicitó un término de no menos de quince (15) días calendario para proveer la evidencia que sustentara sus razones para no vacunarse.

89. Mediante carta del 9 de julio de 2021, IADG le concedió un término adicional de cinco (5) días para presentar la información solicitada.

90. El 12 de julio de 2021 Torres presentó comunicación al patrono en la cual indicó que se encontraba bajo licencia de enfermedad. Solicitó un término de 15 días para lidiar con los requerimientos del patrono y que se le entregara el procedimiento de acomodo razonable de la empresa para estar orientada y cumplir con el proceso interno a cabalidad. En dicha carta manifiesta su rechazo a que se concluyera que su negación a la vacunación significaba que no tenía interés en su trabajo.

91. El 13 de julio de 2021, IADG le envió una carta informándole que no proveerá la extensión solicitada dado que Torres fue informada de la política de vacunación desde el 3 de mayo de 2021, y ya se le habían concedido varias extensiones, por lo cual debía presentar la información solicitada en o antes del 14 de julio de 2021.

92. El 14 de julio de 2021, Torres envió un certificado médico del Dr. Edwin Valentín Malavé ("Dr. Valentín"). Además, incluyó certificado médico del psiquiatra, José Ríos Cervantes, en el cual recomendaba descanso y medicación desde el 14 de julio al 28 de julio de 2021.

93. Desde el 16 de julio hasta el 22 de julio de 2021, Torres fue hospitalizada parcialmente en el Hospital Menonita CIMA en Aibonito.

94. El 22 de julio de 2021, Torres, a través de su representante legal Lcda. Lydiar Rivera ("Lcda. Rivera"), presentó una carta de su párroco con fecha del 16 de julio de 2021. Esta lee:

"a quien corresponda:

La presente es para informar que la persona portadora de esta carta no desea recibir la vacuna contra el COVID.

Ella es feligrés en nuestra Parroquia. Nosotros, como Iglesia, no hemos puesto objeciones para la recepción de la vacuna, tampoco la hemos impuesto. Hemos permitido que cada fiel, desde su conciencia, elija lo que crea más conveniente.

La Iglesia siempre ha defendido que la vacunación debe ser voluntaria y que cada uno puede acogeré, desde su conciencia, a oponerse a la misma.

De igual forma, entendemos que hay otros medios para evitar los contagios de las enfermedades, en especial del COVID, que han resultado más efectivos que la misma vacuna.

Agradecemos le pueda conceder el acomodo razonable en este caso en específico..."

95. La carta del 16 de julio de 2021 no dice que la Iglesia Católica prohíbe a los católicos vacunarse.

96. El 27 de julio de 2021, IADG le envió a Torres carta informándole que; "el certificado médico, enviado el 14 de julio de 2021, del Dr. Valentín se considerará como una solicitud de acomodo razonable, pero que para evaluar dicha solicitud deberá presentar, a más tardar el 30 de julio de 2021, el documento que se incluyó con dicha carta cumplimentado por el Dr. Valentín."

97. El 29 de julio de 2021, Torres, por conducto de la Lcda. Rivera, remitió el cuestionario cumplimentado por el Dr. Valentín.

98. IAGD le envió correo electrónico a Torres por conducto de la Lcda. Rivera, en el que se indica que; "el documento del Dr. Valentín, enviado el 29 de julio de 2021, en algunas partes no se entendía y se le solicitó que enviara el documento de nuevo".

99. El 29 de julio de 2021, la Lcda. Rivera, en representación de Torres, solicitó que se le proveyera término adicional para proveer el documento solicitado de manera legible y proveyó el número de teléfono del Dr. Valentín para que IADG pudiera corroborar la información directamente con el doctor de no haber mecanismo para proveer el formulario de forma legible.

100. El 30 de julio de 2021, se le informó a Torres que IADG había intentado comunicarse con el Dr. Valentín al número de teléfono provisto por la Lcda. Rivera, pero nunca lograron hablar con el doctor.

101. El 2 de agosto de 2021, IADG nuevamente le informó a Torres, por conducto de la Lcda. Rivera, que utilizando el número de teléfono provisto por ella aún no se habían podido comunicar con el Dr. Valentín y, se le envió una versión digital del documento originalmente enviado el 27 de julio de 2021, para que así el Doctor pueda completarlo de manera electrónica.

102. El 10 de agosto de 2021, IADG le envió un correo electrónico a Torres, a través de la Lcda. Rivera, informando que el documento no era legible y que, por lo tanto, le enviaron un correo electrónico al Dr. Valentín, solicitando que provea el documento de manera legible o llenándolo de manera electrónica con la versión digital que se le envió el 2 de agosto de 2021.

103. El 17 de agosto de 2021, IADG le envió carta a Torres la cual informó que; "siguiendo el proceso interactivo, se han hecho gestiones para conseguir una versión que se pueda comprender de la documentación médica que presentaron del Dr. Valentín, pero no habían recibido respuesta del doctor ni de ella. No obstante, que, en ánimos de continuar el proceso interactivo, necesitaban que el Dr. Valentín respondiera a unas preguntas adicionales que se adjuntaron al documento".

104. El 24 de agosto de 2021, la Lcda. Rivera, en representación de Torres, envió un certificado médico del Dr. Valentín, con fecha del 11 de agosto de 2021, donde éste le recomienda a Torres no vacunarse contra el COVID-19, ya que "no se le asegura que la paciente (Torres) tenga efectos secundarios de la misma por su condición de fibrosis pulmonar y no es segura para su salud".

105. En respuesta, el 25 de agosto de 2021, la Sra. Elisa Pacheco le envió correo electrónico a Torres, mediante la Lcda. Rivera, informando que tan pronto recibieran las preguntas adicionales, que les fueron enviadas el 17 de agosto de 2021, debidamente contestadas, podían continuar con el proceso de evaluación. En dicho correo se le anejó nuevamente las preguntas previamente enviadas.

106. El 30 de agosto de 2021, IADG dio seguimiento del correo electrónico del 25 de agosto de 2021, e incluyó una carta donde se le provee a Torres hasta el 3 de septiembre de 2021, para proveer las contestaciones a las preguntas adicionales que se le enviaron el 17 de agosto de 2021, ya que aún no habían recibido respuesta alguna o, de lo contrario se consideraría que voluntariamente desistió a su solicitud de acomode razonable[.]

107. En dicha carta del 30 de agosto de 2021, se le informó a Torres que de no proveer la información solicitada el 3 de septiembre de 2021, debía presentarse a trabajar el 10 de septiembre de 2021, cumpliendo con la política de vacunación.

108. El 13 de septiembre de 2021, la Sra. Pacheco envió carta a Torres, informándole que dado a que, para el 3 de septiembre de 2021, no se habían provisto las contestaciones a las preguntas por parte del Dr. Valentín, y que para el 10 de septiembre de 2021 no se presentó a trabajar con la evidencia de que se había vacunado, se le dio de baja de los registros de IADG.

109. Torres comenzó a recibir su seguro social por incapacidad en el mes de enero de 2024, recibiendo la cantidad de $1,694.00.[4]

Conforme a las determinaciones de hechos, antes citadas, **el TPI resolvió que luego de realizar un balance de intereses, no hubo discrimen por religión o creencia puesto que los derechos individuales como el mencionado no son absolutos**. El tribunal **concluyó que ninguno de los demandantes pudo establecer mediante prueba que la vacuna fuese opuesta a los dogmas de la religión que profesan**. Además, **determinó que los beneficios de la salud de la comunidad general eran mayores a los**

---

[4] Apéndice del recurso KLCE202500389, págs. 38-56.

**beneficios individuales de los apelantes-demandantes en torno a la vacunación contra el virus.**[5]

Por otro lado, **en cuanto a la causa de acción por despido injustificado emitió las siguientes expresiones**:

> …[E]l tribunal entiende que Bella Group tenía un deber de tomar aquellas medidas cautelares necesarias para asegurarse de que sus empleados trabajasen en un lugar seguro y libre de contagio, especialmente cuando estas últimas pueden atentar contra la vida de los empleados y el buen funcionamiento de la empresa. Sin embargo, este tribunal no está completamente convencido que el único método de prevención era la vacunación, particularmente cuanto esta no evitaba el contagio totalmente. ¿Es esto razonable? Sabemos que había otras medidas menos onerosas como hacerse la prueba de Covid-19 semanalmente, utilizar la mascarilla. La prueba presentada, apunta en que la única alternativa era vacunarse o ser despedido porque tampoco había la oportunidad de un acomodo razonable.[6]

Por lo anterior, **el foro primario decidió declarar NO HA LUGAR las reclamaciones en las solicitudes de sentencia sumaría al amparo de la Ley Núm. 80, pues entendió que existen controversias que no pueden desestimarse por la vía sumaria**.

Inconforme con lo decidido por el foro primario los apelantes-demandantes presentaron una *Moción en Solicitud de Determinaciones de Hechos y de Derecho Adicionales y en Solicitud de Reconsideración*[7] la cual fue declarada No Ha Lugar.[8] Aún inconformes, estos acudieron ante nosotros y en su recurso expusieron los siguientes señalamientos de error:

1. Erró el TPI al desestimar las reclamaciones de los Apelantes sobre discrimen religioso bajo la Ley Núm. 100, ya que no aplicó estándares del Título VII del Civil Rights Act de 1964, según interpretados en *Groff v. DeJoy*, 600 U.S. 447 (2023), según estaba obligado por *Jiménez Soto v. Carolina Catering Corp.*, 2025 TSPR 3. Conforme a lo resuelto en Groff v. DeJoy, 600 U.S. 447 (2023), los patronos están obligado a otorgar acomodos razonables para las prácticas religiosas sinceras de sus empleados, salvo que puedan demostrar, con evidencia concreta, que

---

[5] Apéndice del recurso KLCE202500389, págs. 55-56.
[6] *Id.*
[7] Apéndice del recurso KLCE202500389, págs. 16-37.
[8] Apéndice del recurso KLCE202500389, págs. 1-2.

dichos acomodos representarían una dificultad excesiva para las operaciones del negocio.

2. Erró el TPI al no dictar sentencia sumaria a favor de los Apelantes, dictaminando que estos establecieron una causa de acción por discrimen religioso bajo la Ley 100 en Puerto Rico, ya que de los hechos materiales no en controversia surge que los Apelantes demostraron: (1) que fueron despedidos; (2) que dicho despido se realizó sin justa causa; (y) presentaron evidencia indicativa de la modalidad de discrimen alegada, en este caso, por razón de religión. Bajo la jurisprudencia federal que ha interpretado las causas de acción de discrimen religioso bajo el Título VII del Civil Rights Act.

3. Erró el TPI al no dictar sentencia sumaria a favor de los Apelantes, ya que estos lograron establecer una causa de acción por discrimen religioso bajo la Ley Núm. 100 al cumplir con los requisitos para demostrar un caso prima facie de discriminación religiosa basada en la falta de acomodo, conforme al estándar establecido bajo el Título VII del Civil Rights Act de 1964. Los empleados probaron, y el patrono no refutó, que (1) poseían una creencia religiosa sincera que entraba en conflicto con un requisito laboral; (2) informaron al patrono sobre el conflicto; (3) fueron despedidos por no cumplir con el requisito laboral en conflicto.

4. Erró el TPI al no dictar sentencia sumaria a favor de los Apelantes, al permitir que los Apelados evadieran su carga probatoria para demostrar que no conceder los acomodos solicitados, suponía una dificultad excesiva, al aceptar prácticas patronales que violan el derecho constitucional al libre ejercicio religioso, y al ignorar las alternativas menos restrictivas que pudieron haber protegido los derechos individuales sin comprometer la seguridad laboral.

Por otro lado, luego de declarada No Ha Lugar una *Solicitud de Determinaciones de Hechos Adicionales y Moción de Reconsideración Parcial*,[9] Bella acudió ante nosotros y en su recurso expuso el siguiente único señalamiento de error:

ERRÓ EL TPI AL NO DESESTIMAR LA CAUSA DE ACCIÓN A BASE DE LA LEY 80, TODA VEZ QUE LA PRUEBA DEMUESTRA QUE LA POLÍTICA DE VACUNACIÓN NO SOLO ES RAZONABLE, SINO QUE OBEDECE UNA [NECESIDAD] DE NEGOCIO DEBIDO A LAS EXTRAORDINARIAS CIRCUNSTANCIAS QUE ATRAVESABA PUERTO RICO POR LA PANDEMIA MUNDIAL.

---

[9] Apéndice del recurso KLCE202500389, págs. 1-15.

Concedimos a la parte apelante-demandada término para entrega su alegato en oposición al recurso de apelación KLAN202500312. Cumplido con lo ordenado, y el recurso KLCE202500389 sometido sin oposición, quedaron ambos recursos perfeccionados y listos para su adjudicación.

**II**

**A**

En nuestro ordenamiento jurídico el mecanismo de sentencia sumaria se rige por la Regla 36 de Procedimiento Civil de 2009, *supra*, en síntesis dispone que para poder adjudicar en los méritos una moción de sentencia sumaria se requiere que se presente "una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente" ya sea sobre la totalidad de la reclamación o parte de esta.

El mecanismo procesal de la sentencia sumaria es un remedio de carácter extraordinario y discrecional. *Sucn. Maldonado v. Sucn. Maldonado*, 166 DPR 154, 184 (2005). El cual tiene como finalidad "propiciar la solución justa, rápida y económica de litigios civiles que no contengan controversias genuinas de hechos materiales". *Const. José Carro v. Mun. de Dorado*, 186 DPR 113, 128 (2012). Por ser la sentencia sumaria un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley". (Énfasis en el original.) (Citas omitidas.) *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 611 (2000).

Al ser esto así, sólo procede que se dicte la sentencia sumaria "cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el Derecho

aplicable y el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109-110 (2015), que cita a *Const. José Carro v. Mun. de Dorado, supra.* De haber alguna duda acerca de la existencia de una controversia sobre los hechos medulares y sustanciales del caso deberá resolverse contra la parte que solicita la moción, haciendo necesaria la celebración de un juicio. *Rivera et al. v. Superior Pkg., Inc. et al,* 132 DPR 115,133 (1992).

Quien promueve la sentencia sumaria "debe demostrar que no existe controversia sustancial o real en cuanto a algún hecho material, es decir, en cuanto a ningún componente de la causa de acción". *Meléndez González v. M. Cuebas, supra,* en la pág. 110. Un hecho material "es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. J.T.S., 2000, T. I, en la pág. 609. Por otra parte, quien se opone a una sentencia sumaria debe presentar contradocumentos y contradeclaraciones que contradigan los hechos incontrovertidos por parte del promovente. *Rivera et al. v. Superior Pkg., Inc. et al., supra.* Por lo cual viene obligada a contestar de forma detallada la solicitud de sentencia sumaria. Regla 36.3(b) de Procedimiento Civil, *supra.*

Se ha pautado que "[l]os jueces no están constreñidos por los hechos o documentos evidenciarios que se aduzcan en la solicitud de sentencia sumaria" y que "[d]eben considerar todos los documentos en autos, sean o no parte de la solicitud, de los cuales surjan admisiones que hagan las partes". *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004). Sin embargo, ante un proceso de sentencia sumaria el tribunal está impedido de dirimir cuestiones de credibilidad. *Id.*

Según se ha establecido jurisprudencialmente, el tribunal apelativo se encuentra en la misma posición que el tribunal de primera instancia al determinar si procede una sentencia sumaria. Sin embargo, al revisar la determinación de primera instancia, el tribunal de apelación está limitado de dos maneras:

1. s[o]lo puede considerar los documentos que se presentaron ante el foro de primera instancia; y
2. el tribunal apelativo s[o]lo puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. No puede adjudicar los hechos materiales esenciales en disputa. *Vera v. Dr. Bravo*, *supra*, págs. 334-335.

El deber de adjudicar hechos materiales y esenciales es una tarea que le compete al Tribunal de Primera Instancia y no al foro revisor. Por consiguiente, el Tribunal Supremo en *Meléndez González et al. v. M. Cuebas*, *supra*, estableció el estándar que debemos utilizar como tribunal revisor al momento de evaluar determinaciones del foro primario en las que se conceden o deniegan mociones de sentencia sumaria. En lo pertinente, dispuso que "[l]a revisión del Tribunal de Apelaciones es *de novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario". *Id.* en la pág. 118. Además, reiteró que por estar en la misma posición que el foro primario, debemos revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma recopilados en la Regla 36 de Procedimiento Civil. *Id.*

Luego que culminemos nuestra revisión del expediente, de encontrar que en realidad existen hechos materiales y esenciales en controversia, debemos tener en cuenta que el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra*, y debe exponer concretamente cuáles

hechos materiales encontró que están controvertidos y cuáles están incontrovertidos. En lo pertinente, establece lo siguiente:

> Si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito [...] y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos [...]". 32 LPRA Ap. V, R. 36.4.

Esta determinación puede hacerse en la Sentencia que disponga del caso y puede hacer referencia al listado de hechos incontrovertidos que emitió el foro primario en su Sentencia. *Id.* Por el contrario, de resultar que los hechos materiales y esenciales realmente están incontrovertidos, entonces nos corresponde revisar *de novo* si el TPI aplicó correctamente el derecho a los hechos incontrovertidos. *Meléndez González et al. v. M. Cuebas, supra,* en la pág. 119. A su vez, la Regla 36.3(e) de Procedimiento Civil, *supra,* dispone como sigue:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar sentencia sumaria a favor de la parte promovente.

La sentencia sumaria solo debe dictarse en casos claros. *Mgmt. Adm. Servs. Corp. v. E.L.A., supra,* en la pág. 611. Por tanto, cuando no existe una clara certeza sobre todos los hechos materiales en la controversia, no procede una sentencia sumaria. No obstante, se ha reiterado que "[e]l solo hecho de no presentar evidencia que controvierta la presentada por la parte promovente no implica que necesariamente procede la sentencia sumaria". *PFZ Props., Inc. v. Gen. Acc. Ins. Co.,* 136 DPR 881, 913 (1994).

Al dictar una sentencia sumaria el Tribunal deberá realizar un análisis dual el cual consiste en: (1) analizar los documentos que

acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal; y (2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. *Vera v. Dr. Bravo*, *supra*, en la pág. 333. Una vez realizado este análisis el tribunal no dictará sentencia sumaria cuando: (1) existen hechos materiales y esenciales controvertidos; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho no procede. *Id.* en las págs. 333-334.

Se ha reiterado mediante una vasta jurisprudencia que el propósito principal de la sentencia sumaria "es propiciar la solución justa, rápida y económica de litigios que no reflejan controversias genuinas sobre hechos materiales, razón por la cual no ameritan la celebración de un juicio en su fondo". *Pilot Life Ins. Co. v. Crespo Martínez*, 136 DPR 624, 632 (1994). Sin embargo, hay que aclarar que aligerar la tramitación de un caso no puede soslayar el principio fundamental de alcanzar una solución justa. *García Rivera et. al. v. Enríquez*, 153 DPR 323, 337-338 (2001); *Cuadrado Lugo v. Santiago Rodríguez*, 126 DPR 272, 279 (1990). Un Tribunal "abusa de su discreción cuando actúa de forma irrazonable, parcializada o arbitraria". *Matías Lebrón v. Depto. Educación*, 172 DPR 859, 875 (2007). Por tanto, corresponde al Tribunal conceder o denegar, en el ejercicio de su discreción, los remedios correspondientes de acuerdo con las circunstancias del litigio.

**B**

La Constitución de Puerto Rico proscribe el discrimen motivado por razones de índole religiosa. Const. P.R., Art. II, Sec. 1.

En el ámbito laboral, la *Ley Antidiscrimen de Puerto Rico*, Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seq.*, (Ley 100), prohíbe, entre otros, el discrimen por razón de religión. De esta forma, la ley establece responsabilidad civil contra los patronos que despidan, suspendan o discriminen contra un empleado respecto a su compensación, términos, categorías, condiciones o privilegios en su empleo. *Id.* Empero, dicha protección no opera en el vacío. Cuando un empleado alegue que se le ha discriminado en el empleo por sus creencias religiosas, tiene el peso de demostrar que la profesa de forma sincera y significativa *("sincerely and meaningful").*[10]

Asimismo, los elementos esenciales para una causa de acción por despido discriminatorio de la Ley Núm. 100 son: que el empleado fue despedido, sin justa causa y que existe la modalidad de discrimen alegado. *Díaz Santiago v. International Textiles*, 195 DPR 862, 873 (2016). Eliminada la presunción de discrimen previamente contemplada por esta ley, el demandante no puede descansar en alegaciones, por lo cual de entrada debe establecer un caso de discrimen en su totalidad, entiéndase un caso *prima facie*. Nuestro Tribunal Supremo ha establecido los siguientes criterios para demostrar un caso *prima facie* de discrimen en un despido: (1) que el empleado es miembro de un grupo protegido; (2) que el empleado estaba cualificado para el trabajo; (3) que el empleado fue despedido, y (4) que el patrono buscó reemplazar al empleado por otra persona con cualificaciones similares. *Jiménez Soto v. Carolina Catering Corp.*, 2025 TSPR 3, en las págs. 23-24 (citas omitidas).

Cumplida esta fase inicial, surge la presunción de despido discriminatorio y así establecido, el patrono puede demostrar una explicación razonable para el despido. Las circunstancias o hechos

---

[10] *United States v. Seeger*, 380 US 163, 176 (1965).

básicos varían según el contexto en que se dé la decisión de empleo y el tipo de discrimen que se alegue. A partir de este momento, el *onus probandi* recae sobre el patrono y, de este no presentar prueba alguna, sólo resta dar por probado el caso del empleado y adjudicar los daños. *SLG Hernández-Beltrán v. TOLIC, supra*, pág. 775. Sin embargo, existe la posibilidad de que el patrono opte por defenderse de varias formas, como sigue: (1) presentar prueba para rebatir la presunción de despido discriminatorio; (2) probar que hubo un despido justificado (justa causa); (3) probar que no hubo tal despido; o (4) presentar prueba de que, a pesar de haber habido un despido injustificado, este no fue discriminatorio. *SLG Hernández-Beltrán v. TOLIC, supra*, pág. 775. No obstante, al empleado aún le asiste otra oportunidad para probar su caso, claro está, sin el beneficio de la presunción. Tendrá que ofrecer prueba específica de incidentes o hechos que demuestren dicho discrimen o de los cuales se pueda inferir el mismo. *Id.*

Finalmente, "[s]i luego de presentada la totalidad de la prueba, queda demostrado que no hubo ánimo o intención discriminatoria en el despido, pero el demandado no logró establecer una justificación razonable" para la cesantía del demandante, "el tribunal deberá concluir que el despido fue injustificado y el empleado será acreedor, exclusivamente, de los remedios establecidos en la Ley 80". *Díaz v. Wyndham Hotel Corp., supra*, pág. 391. Por otro lado, si "el tribunal determina que el despido efectivamente fue discriminatorio y, por ende, injustificado, entonces procederá a imponer los remedios provistos por la Ley 100", de forma exclusiva. *Id.*

**C**

La *Ley Sobre Despidos Injustificados*, Ley Núm. 80 del 30 de mayo de 1976, 29 LPRA sec. 185a, establece que todo empleado que trabaja para un patrono mediante remuneración, contratado sin

tiempo determinado, que sea despedido sin justa causa, tendrá derecho a recibir de su patrono una indemnización. El propósito de esta ley es "proteger a los empleados de actuaciones arbitrarias del patrono al disponer de remedios económicos que desalienten los despidos injustificados". *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 770 (2022). Por tanto, el fin es uno social y coercitivo, pues se castiga al patrono que despide injustificadamente, y además provee una indemnización al empleado. *Jusino et als. v. Walgreens*, 155 DPR 560, 571 (2001). Es importante señalar que no hay ninguna prohibición absoluta al despido de un empleado ya que siempre puede despedirse un empleado si existe justa causa. Sin embargo, cuando no hay justa causa, el patrono deberá indemnizar mediante el pago de la mesada. *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 230-231 (2015).

Por *justa causa*, se entiende aquel despido que no esté motivado por razones legalmente prohibidas y que no sea resultado del mero capricho del patrono, además, aquellos despidos que afecten el buen y normal funcionamiento de un establecimiento. 29 LPRA sec. 185b; Véase *León Torres v. Rivera Lebrón*, 204 DPR 20, 37 (2020). La ley expresamente contempla determinadas situaciones que se entienden como justa causa para el despido de un empleado. Entre estas se encuentran: (1) patrón de conducta impropia del empleado; (2) patrón de desempeño deficiente del empleado; (3) violación de los reglamentos de la empresa; (4) cierre total, temporero, o parcial de las operaciones de la empresa; (5) reorganización; y (6) reducción en el volumen de producción de la empresa. *Id.*

Los patronos tienen autoridad para establecer los reglamentos internos y normas de conducta en el lugar de empleo que estimen necesarios. Una vez adoptadas, los empleados están sujetos a cumplir estas reglas, siempre que sean razonables. Por tanto, las

violaciones a estas normas del empleo serán *justa causa* para el despido cuando el patrono demuestre: (1) que las reglas son razonables; (2) que se le suministró copia escrita de dichas normas al empleado, y (3) que el empleado las violó en reiteradas ocasiones. *Jusino et als. v. Walgreens, supra*, en la pág. 573.

**III**

La controversia que nos ocupa gira en torno a revisar y determinar si el foro de instancia se equivocó al desestimar las reclamaciones por razón de discrimen religioso por la vía sumaria y en cambio, mantener las reclamaciones de despido injustificado de cada demandante para ser dilucidadas en sus méritos. De entrada, colegimos que luego de haber cumplido con nuestra función revisora y escudriñar *de novo* el expediente del caso, resolvemos que el foro primario actuó conforme a derecho en desestimar las causas de acción por discrimen religioso. No obstante, hallamos que no hay controversias de hecho ni de derecho en cuanto a las reclamaciones de despido injustificado del apelantes-demandantes por lo que procedía de igual manera ordenar su desestimación, con excepción de la Sra. Torres Jiménez. Nos explicamos a continuación.

Los cuatro señalamientos de error de los apelantes-demandantes se resumen en que estos alegan que el TPI se equivocó en desestimar las causas de acción por discrimen religioso por no aplicar correctamente los estándares aplicables y concluir que no lograron establecer un caso *prima facie*. Repasamos que, tal y como reseñamos en el derecho aplicable, nos encontramos ante un esquema donde los apelantes-demandantes cargan con el peso de la prueba para establecer un caso *prima facie* de discrimen. Para ello es necesario que demuestren que son miembros de: (1) un grupo protegido; (2) que estaban cualificados para el trabajo; (3) que fueron despedidos, y (4) que el patrono buscó reemplazarlos por otras personas con cualificaciones similares. Sin embargo, según la

prueba que obra en el expediente, ninguno de los apelantes-demandantes logró cumplir con todos los requisitos mencionados por lo que no establecieron un caso prima facie de discrimen. Cónsono con lo anterior, lo procedente era desestimar las causas de acción al amparo de la Constitución y la Ley 100. Por tal motivo, no les asiste la razón a los demandantes-apelantes en cuanto a sus cuatro (4) señalamientos de error pues establecer un caso *prima facie* de discrimen resulta ser la médula de la controversia. A raíz de que los apelantes-demandantes no lograron cumplir con los requisitos mencionados, no cabe hablar de discrimen alguno. Por lo que, de igual manera resulta inmeritorio detallar los señalamientos de error.

Por otro lado, el comunicado del patrono Bella fue preciso en establecer la necesidad de vacunación contra el COVID-19 para continuar con sus funciones y a la vez garantizar un espacio seguro tanto para sus empleados como para sus clientes. No obstante, señaló como excepción a la vacunación razones religiosas o médicas. A la luz de lo anterior y lo establecido en las determinaciones de hechos sostenidas por la prueba que obra en el expediente, los señores Hernández Negrón y Ortiz Cintrón no presentaron excusa válida alguna que impidiera la vacunación. Por lo anterior no estaban exentos de vacunarse pues no caían bajo alguna de las excepciones admitidas que diera paso a evaluar un posible acomodo razonable. Ahora bien, los apelantes-demandantes que profesan la fe católica se sustentaron en comunicados de parte de sus respectivos párrocos. No obstante, la Iglesia Católica abiertamente comunicó que no se oponía a la vacunación de una manera general, sino que dejaba dicha decisión a discreción individual. Al ser ello así, realmente no estamos ante un impedimento avalado por un motivo religioso. Por lo que Bella no incurrió en discrimen y por consiguiente tampoco en un despido injustificado.

Ahora bien, el caso de la Sra. Torres Jiménez es distinto puesto que además de proveer una excusa por motivo de religión por la cual no se había vacunado, también proveyó excusas médicas a través de certificaciones firmadas por su médico el Dr. Edwin Valentín Malavé y su psiquiatra el Dr. José Ríos Cervantes. Durante el proceso de evaluación del pedido de la Sra. Torres Jiménez, Bella exigió se proveyera documentación adicional y así cumplió con ello la Sra. Torres Jiménez, pero el proceso tuvo sus interrupciones puesto que la Sra. Torres Jiménez se encontraba delicada de salud. No obstante, esta mantuvo comunicación con su patrono y solicitó las prórrogas pertinentes de manera oportuna. Sin embargo, durante el proceso se le solicitó al Dr. Valentín Malavé que cursara nuevamente las contestaciones que realizó a unas preguntas porque estas no se entendían. A falta de este trámite, la Sra. Torres Jiménez solicitó una prórroga la cual fue denegada por Bella y le concedió un término final con el cual la Sra. Torres Jiménez no pudo cumplir. Luego de esto fue despedida de su empleo.

A la luz de la prueba documental presentada que sustenta lo antes sintetizado no cabe hablar de resolver dicha controversia por la vía sumaria, por lo que sustentamos la decisión del TPI de verla en sus méritos ya que, tanto el foro primario como este foro intermedio, no quedamos totalmente convencidos de que lo ocurrido constituye justa causa para el despido.

**IV**

Por los fundamentos anteriormente expuestos, modificamos la sentencia sumaria parcial apelada para que también se desestimen las causas de acción de los apelantes-demandantes por motivo de despido injustificado con excepción de la Sra. Delma Torres Jiménez. Así modificada, confirmamos y devolvemos el caso al Tribunal de Primera Instancia, Sala de Bayamón para que continúen los procedimientos conforme a lo aquí resuelto.

Notifíquese.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones